**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| United States of America ex rel. The Tarbell Group, LLC,<br><br>Plaintiff<br><br>v.<br><br>Adams Community Economic Development Corporation, et al.,<br><br>Defendants | Case no. 4:25-cv-119-SMR-SBJ |

**RELATOR'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

## I. Introduction

Plaintiff-Relator The Tarbell Group, LLC ("Relator") brings this action on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "Act" or "FCA"), to recover over $3 million in funds that thirty-four Iowa organizations obtained from the Small Business Administration ("SBA") under the Paycheck Protection Program ("PPP") by falsely certifying their eligibility for the same. Each is a non-charitable, tax-exempt business under a paragraph of the Internal Revenue Code, 26 U.S.C. § 501(c) that the PPP excluded from eligibility until December 27, 2020 (501(c)(6)'s) or March 11, 2021 (all others). Each obtained its first-draw loan long before the date on which it became eligible. First Amended Complaint, Dkt. 92 ("FAC") ¶¶ 4-37, 45-49, 51 & attached loan table. Thirteen of them are also private clubs that limit membership for reasons other than capacity, a category the PPP excluded at all times. *Id.*, ¶¶ 50, 52, 69. Every defendant nonetheless certified, on the SBA's prescribed application form, that it was "eligible to receive a loan under the rules in effect at the time this application is submitted," and certified again on its forgiveness application. *Id.*, ¶¶ 43-44, 57-58, 64, 71, 76-77, 84-85, 91-92.

Six motions and two joinders, filed by thirty of the thirty-four institutional defendants, are before the Court: Dkt. 128 (thirteen defendants represented by Weinhardt & Lantz, the "W&L Defendants"), Dkt. 129 (Treynor Recreation Area), Dkt. 130 (The Des Moines Embassy Club, Urbandale Golf and Country Club, and Washington Golf & Country Club, the "Dickinson Defendants"), Dkt. 131 (Agribusiness Association of Iowa, "AAI"), Dkt. 132 (Appanoose Country Club), Dkt. 133 (Geneva Golf & Country Club), Dkt. 134 (six defendants represented by Gordon Rees, the "GRSM Defendants"), and Dkt. 135 (four defendants represented by Dentons, the "Joining Defendants"). Each of the later filings joins Dkt. 128, and several join one another, so the bases advanced for dismissal overlap heavily. The table in Part II summarizes each proffered basis, its location in the defendants' various briefs, and why it fails. Relator answers the bases seriatim in Part IV. None supports dismissal.

Two features of the motions deserve mention at the outset.

First, the centerpiece of the defendants' public-disclosure bar defense rests on a premise rejected by both the Eighth Circuit and this Court: that public disclosure of a transaction, without disclosure of the misrepresentation that made it false, or without disclosure of the knowing character of the misrepresentation, triggers the bar. *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512-14 (8th Cir. 1994) (reversing dismissal where corporate reports, newspaper articles, and creditors' meeting disclosures had made public a subsidiary's pension underfunding but had not disclosed that its parent intentionally understated the liability); *Grant v. Zorn*, No. 4:18-cv-95, 2021 U.S. Dist. LEXIS 174861, at *12-13 (S.D. Iowa Mar. 8, 2021) (Rose, J.) (holding that audit letters which identified errors in a defendant's claims, but not that the claims were "knowingly false," did not trigger the bar.), *aff'd*, *Grant ex rel. United States v. Zorn*, 107 F.4th 782, 792-93 (8th Cir. 2024). This case rests entirely on misrepresentations made in non-public documents:

the defendants' PPP application forms and forgiveness forms. Neither those documents, nor the knowingly false character of the misrepresentations they contain, have ever been publicly disclosed. The only federal appellate decision to address the bar in a PPP case built on the same public loan data held that the bar did not apply, and reversed the district court. *United States ex rel. Relator, LLC v. Erskine*, 182 F.4th 785, 792-93 (9th Cir. 2026). None of the motions cites it. The implication of the movants' argument is that the public record has already proved each of them guilty of fraud.

Second, the Dickinson Defendants and Appanoose argue that the American Rescue Plan Act ("ARPA") retroactively made them eligible and displaced the private club exclusion. The Act says the opposite. It extended eligibility prospectively, on conditions, and it expressly excluded from the newly eligible class any entity described in 13 C.F.R. § 120.110, the regulation that excludes private clubs. Pub. L. No. 117-2, § 5001(a)(1), 135 Stat. 4, 82-83 (2021).

**II. Summary of the Grounds Asserted and Why Each Fails**

| **Ground asserted** | **Raised by (docket number, internal page)** | **Why it fails** |
|---|---|---|
| Public disclosure bar, 31 U.S.C. § 3730(e)(4): the suit rests on public loan data, tax filings, statutes, and club websites | W&L (Dkt. 128-1, at 12-19); Appanoose (Dkt. 132-1, at 7-10); joined by all others | The case turns entirely on defendants' non-public application forms. No enumerated source disclosed the misrepresented state of facts, any defendant's certification of eligibility, or the knowledge with which it was made. This Court held in *Zorn*, and the Eighth Circuit affirmed, that a source disclosing errors but not knowledge does not trigger the bar. *Rabushka*, *Allina*, *Erskine*, *Craig*, *Tennyson*, *iLink*, and *Baxter* likewise condition the bar upon public disclosure of *both* the true facts *and* the misrepresentation. The bar does not apply to the private clubs, whose membership criteria are not publicly disclosed by an enumerated source. Part IV.A, at 8-22 |

| **Ground asserted** | **Raised by (docket number, internal page)** | **Why it fails** |
|---|---|---|
| Rule 9(b) particularity | W&L (Dkt. 128-1, at 11-12); Appanoose (Dkt. 132-1, at 6-7); joined by all others | Every claim is identified by loan number, draw, approval date, amount, forgiveness date, and amount, and the certification is quoted verbatim by form version. Rule 9(b) does not require naming the corporate signer. *BTVAR* upheld Relator's very similar complaint against Rule 9(b) challenge.<br>Part IV.B, at 22-26 |
| Scienter not plausibly pleaded | W&L (Dkt. 128-1, at 8-11); Treynor (Dkt. 129, at 2-3); Dickinson (Dkt. 130-1, at 5); Appanoose (Dkt. 132-1, at 4-6); joined by all others | Knowledge may be alleged generally, includes deliberate ignorance and reckless disregard, and is plausibly shown by a statute and published rules that named the eligible and ineligible nonprofits, a form that listed no category of eligible nonprofit that fit any defendant, and a twice-made certification of eligibility.<br>Part IV.C, at 26-31 |
| Materiality: SBA approved and forgave the loans with "access" to the defendants' tax status | Dickinson (Dkt. 130-1, at 5-6); Appanoose (Dkt. 132-1, at 10-11) | The eligibility certification was an express condition of payment, one of very few express certifications the SBA demanded on its application forms. The government could not independently audit 11M+ PPP loan applicants, hence the need for honest self-certification. It is implausible that the government would have disbursed over $3M to defendants had they refused to certify eligibility. *Escobar* asks whether the government paid with actual knowledge of the violation, and no movant alleges that SBA knew. Declination is of "minimal significance." *Holt*.<br>Part IV.D, at 32-35 |
| ARPA retroactively conferred eligibility and displaced the private club exclusion | Dickinson (Dkt. 130-1, at 4-6); Appanoose (Dkt. 132-1, at 11-12) | ARPA conferred eligibility on March 11, 2021, prospectively and on conditions, and expressly carried forward the exclusions of 13 C.F.R. § 120.110. SBA applied it only to loans approved on or after that date. 86 Fed. Reg. 15083, 15084.<br>Part IV.E, at 35-38 |

| **Ground asserted** | **Raised by (docket number, internal page)** | **Why it fails** |
|---|---|---|
| Private club allegations conclusory | Dickinson (Dkt. 130-1, at 4-5) | The FAC pleads, club by club, the sponsorship, initiation, invitation, shareholding, and members-only restrictions that limit membership for reasons other than capacity. Whether a limit is capacity-based is a question of fact.<br>Part IV.F, at 39 |
| AAI is a 501(c)(6) organization, not a 501(c)(5) organization | AAI (Dkt. 131-1, at 5-7) | The FAC's allegation rests on AAI's IRS status and tax returns over many years, including for the year it applied. AAI's contrary assertion is an unproven fact allegation outside the pleadings, and even a 501(c)(6) organization was eligible only on statutory conditions AAI does not address.<br>Part IV.G, at 39-42 |
| Treynor "expressly represented" its 501(c)(7) status | Treynor (Dkt. 129, at 2-3) | Disclosing status to a lender does not make a certification of eligibility true. The hand-altered checkbox confirms that Treynor knew the form contemplated no organization like it.<br>Part IV.C, at 31 |
| Insufficient process: the Court's unsealing order and the declination notice were not served | AAI (Dkt. 131-1, at 7-8); W&L (Dkt. 128-1, at 19-20); Geneva (Dkt. 133, at 2); Treynor (Dkt. 129, at 3 n.2) | Process under Rule 4 is the summons and complaint, both timely served. The two docket papers omitted have since been served through the ECF system, were available to every movant in the ECF system throughout, and the omission caused no prejudice and does not warrant dismissal.<br>Part IV.H, at 42-43 |
| Misjoinder | AAI (Dkt. 131-1, at 8-9); W&L (Dkt. 128-1, at 20); Geneva; Treynor | "Misjoinder of parties is not a ground for dismissing an action." Rule 21. Every question of law is common to all defendants, Fed. R. Civ. P. 20(a)(2)(B), the claims arise from one program, one rule, and one form, *Mosley*, and joint adjudication of identical motions is the economical course through the pleading stage. No defendant has moved to sever, and Relator likely would not oppose severance after the pleading stage, and may seek it. Rule 21 forbids dismissal for misjoinder.<br>Part IV.I, at 43-46 |

| **Ground asserted** | **Raised by (docket number, internal page)** | **Why it fails** |
|---|---|---|
| Dismissal with prejudice, and attorney fees | W&L, Dickinson, Appanoose, Geneva, GRSM (conclusions) | No movant attempts to show futility, and no movant attempts the showing that 31 U.S.C. § 3730(d)(4) requires for fees. Such a showing is impossible in light of dozens of other similar PPP cases successfully brought against 501c organizations.<br>Part IV.J, at 46-48 |

## III. Legal Standards

The Act generally attaches liability to anyone who "knowingly" makes a false statement to obtain money from, or avoid paying money owed to, the United States. 31 U.S.C. § 3729(a)(1). "Knowingly" is defined expansively. It requires "no proof of specific intent to defraud," and encompasses actual knowledge, deliberate ignorance, or reckless disregard for the truth or falsity of the false statement. *Id.*, § 3729(b)(1).

A complaint survives a motion under Rule 12(b)(6) if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts the well-pleaded allegations as true and draws every reasonable inference for the pleader. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). An FCA claim requires that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew [as "knowing" is broadly defined under the Act] the claim was false or fraudulent." *Thayer v. Planned Parenthood of the Heartland, Inc.*, 11 F.4th 934, 938 (8th Cir. 2021) (citation omitted).

Rule 9(b) requires the circumstances of an alleged misrepresentation to be stated with particularity, but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Rule is read "in harmony with the principles of notice pleading," *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (citation omitted). Its purpose is to give

the defendant notice of the misconduct charged, sufficient "to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 919 (8th Cir. 2014) (citation omitted). It does not require a plaintiff to plead its evidence. A complaint is "just the starting point," and "[i]nstead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (Easterbrook, J.). Where the facts constituting the fraud "are peculiarly within the opposing party's knowledge," they may be pleaded on information and belief if accompanied by a statement of the facts on which the belief is founded. *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1163 (8th Cir. 2019) (cleaned up).

The Act's so-called public disclosure bar is not jurisdictional and is tested under Rule 12(b)(6). *United States ex rel. Ambrosecchia v. Paddock Labs., LLC*, 855 F.3d 949, 953-54 (8th Cir. 2017). It applies only where "substantially the same allegations or transactions as alleged in the action" were already "publicly disclosed—(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A). The movant bears the burden of showing a qualifying disclosure, and only if it carries that burden does the question whether the relator is an original source arise. *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 692 (8th Cir. 2014).

An essential element of a claim under the Act is a misrepresentation that is "knowing," as broadly defined by the Act. As this Court has held, the public disclosure bar does not reach a claim based on a representation whose knowingly false character was not publicly disclosed in one of

the three verboten enumerated sources. Nor does it bar a claim where the false representation itself was not so disclosed. *Zorn*, 2021 U.S. Dist. LEXIS 174861, at *12-13.

Where none of the bar's three enumerated sources contains an outright allegation of fraud, the Eighth Circuit, following the D.C. Circuit, asks whether the essential elements of the fraud were themselves disclosed: "if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z . . . ." *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994), *cited in Rabushka*, 40 F.3d at 1512. To trigger the bar, "a public disclosure must reveal both the true state of facts and that the defendant represented the facts to be something other than what they were." *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044 (8th Cir. 2002). Because the bar is an affirmative defense, it supports dismissal under Rule 12(b)(6) only if it is apparent on the face of the complaint. Thus, "the district court is limited to the materials properly before it on a motion to dismiss, which may include public records and materials embraced by the complaint." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008).

## IV. Argument

### A. The public disclosure bar does not apply, because no enumerated source disclosed the misrepresentation on which every count rests.

#### 1. The bar does not apply to any defendant, because no enumerated source disclosed the knowing misrepresentation on which every count rests.

The W&L Defendants, and every defendant that joins them, argue that "every single fact" in the FAC can be found in the SBA's loan database, the blank application forms, the IRS's exempt-organization listings, public laws, and a few club websites, so the suit is barred. Dkt. 128-1, at 13-16. The contention is at odds with the precedent of the Eighth Circuit and this Court, the only

federal appellate decision to address PPP claims under the Act in similar circumstances, and numerous district court decisions upholding PPP FCA claims against the identical challenge.

Defendants' argument erroneously equates the public existence of a loan with public disclosure of the knowing misrepresentation that procured it. The Eighth Circuit has rejected that equation since *Rabushka*, in which it held that reliance on "the mere disclosure of the 'subject transactions' reads the jurisdictional bar too broadly," and that "the essential elements exposing the transaction as fraudulent must be publicly disclosed as well." 40 F.3d at 1512. Public sources that "report[] seemingly legitimate transactions and fail[] to suggest to the uninitiated reader the state of affairs alleged" do not trigger the bar, *id.*, at 1513, which "is given effect when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *Id.*, at 1514. In other words, "a public disclosure must reveal both the true state of facts and that the defendant represented the facts to be something other than what they were." *Allina*, 276 F.3d at 1044 (holding that a government audit which revealed that the defendants had represented that anesthesiologists performed the cases billed, but not that they had failed to do so, was not a public disclosure). The Act was amended in 2010 to change the statute's enumerated sources and its jurisdictional character, but not the meaning of "allegations or transactions," and the Eighth Circuit continues to apply *Rabushka* under the amended text. *United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 947 (8th Cir. 2017) ("'[M]ere disclosure of the subject matter transaction [is] . . . insufficient to prevent a qui tam suit'" (quoting *Rabushka*, 40 F.3d at 1512)).

The circumstances at bar mirror those in *Rabushka*. The public record there showed that the subsidiary's pension was underfunded and that the government had assumed the liability, which was the true state of facts, and the suit survived because no source showed that the parent

had represented the liability to be smaller than it knew it to be. The public record here shows that each defendant received a loan and holds a stated tax status, but no source shows that any defendant misrepresented itself to be eligible, or that it did so knowingly. The movants' position, taken at its word, is that the public record already discloses that each of them knowingly certified a false eligibility, which is to say that the public record convicts them of the fraud they deny. No movant embraces that position, and the bar does not permit them to have it both ways.

The sine qua non of every count is each defendant's certification that it was "eligible to receive a loan under the rules in effect at the time this application is submitted." FAC ¶¶ 57-58, 64, 71. That certification appears in two places, neither public: the defendant's completed application (SBA Form 2483 or 2483-SD) and its completed forgiveness application (Form 3508, 3508EZ, or 3508S). *Id.*, ¶¶ 43-44, 76-77, 84-85, 91-92. The public sources catalogued by the movants supply, at most, the true state of facts: that a named organization received a loan of a stated amount on a stated date, that the loan was forgiven, that the organization is exempt under a stated paragraph of section 501(c), and that Congress admitted that paragraph to the program on a stated date. None of those sources contains a representation by any defendant about eligibility or anything else, true or false. The SBA's database records what the SBA did. A blank form records what an applicant would have to say, not what any applicant said. A Form 990 records a tax classification. A public law records the law. Assemble all of it, and the assembly still lacks the element without which there is no FCA violation to infer: that this defendant represented itself to be eligible when it was not, and did so knowingly. That is the "misrepresented state of facts" *Allina* requires, and the movants identify no source that disclosed it. They cite no document that mentions any defendant in connection with its PPP eligibility.

The Ninth Circuit, applying the same formula the Eighth Circuit adopted in *Rabushka*, has held that where the public sources supply one variable and the relator's complaint supplies the other, the bar does not apply. In *Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154 (9th Cir. 2024), the public record contained patent prosecutions, a trade press article, and published studies that, viewed together, "possibly reveal some of these true and misrepresented facts, but nothing in combination from which fraud can reasonably be inferred." *Id.*, at 1168. The disclosures "may each contain a piece of the puzzle, but when pieced together, they fail to present the full picture of fraud," and it was the relator who, "[i]n his qui tam action, . . . filled the gaps by stitching together the material elements of the allegedly fraudulent scheme." *Id.* The court added that the allegations in the complaint supplied "a critical fact necessary for scienter" that no disclosure revealed. *Id.* Here the public sources likewise supply the true state of facts and nothing else. The misrepresentation, each defendant's certification of eligibility, and the knowledge with which it was made appear in the FAC alone, not in the public record. A relator who supplies the misrepresented state of facts through his pleading has not fed off a public disclosure. He has made the allegation the public record lacked.

The movants anticipate the point and respond to it in a footnote: even if the applications are non-public, "the fact remains that Tarbell's claims are founded entirely on information broadly available to the public." Dkt. 128-1, at 14 n.3. That is not the statutory question. The Act asks whether "substantially the same allegations or transactions as alleged in the action" were publicly disclosed in an enumerated source. 31 U.S.C. § 3730(e)(4)(A). The inquiry is objective. It looks to what the enumerated sources disclosed. What they disclosed here is a set of loans, not a set of knowingly false certifications.

The inference the movants propose contravenes the purpose of the bar. The bar was written for the suit that follows an investigation someone else has already completed. The relator in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), whose suit prompted the first version of the bar, took his allegations from a federal criminal indictment in which the government had already charged the fraud. The Supreme Court has described that suit as "a quintessential 'parasitic' suit" and the bar Congress later adopted as an effort "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits such as the one in *Hess*." *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). A fraud under the Act has two components, (1) a misrepresentation and (2) knowledge the Act defines broadly. A suit is parasitic when an enumerated source has already exposed both, so that the relator adds nothing to what a prosecutor, an auditor, or a reporter has already described. Nothing of the kind happened here. No government investigation, audit, or hearing, and no news report, has alleged that any movant misrepresented its eligibility, and none has alleged that any movant did so knowingly. Nor, so far as the record shows, has anyone else.

The bar asks whether the fraud was publicly disclosed, and a loan received in error is not fraud under the Act. This Court has so held, and the Eighth Circuit has affirmed. In *Zorn*, the defendants argued that two audit letters from a Medicare contractor, identifying errors in the defendant's billing, publicly disclosed the fraud. The Court held that the letters "did not reveal any indication of intentional fraudulent misrepresentations sufficient to disclose his scienter," because a relator "is required to prove the 'true state of facts' was that the claims submitted were knowingly false." *Zorn*, 2021 U.S. Dist. LEXIS 174861, at *12-13. The Court reiterated that ruling after trial, because letters that were "remedial" on their face could not have "alerted [the relator] to the fraud." *Zorn*, No. 4:18-cv-95, Doc. 139, at 42-43 (S.D. Iowa Sept. 23, 2022) (Rose, C.J.). The Eighth

Circuit affirmed. The letters "revealed only the possibility of inaccurate billing. They did not disclose that the fraudulent actions had occurred," and "an uninitiated reader of the [audit] letters would infer that the defendants had acted without the requisite scienter." *Zorn*, 107 F.4th at 793 (citing *Rabushka*, 40 F.3d at 1513, for its holding that the public information "fail[ed] to suggest to the uninitiated reader . . . that [the defendant's] pension liability was *intentionally* understated" (emphasis by the *Zorn* court)).

The audit letters in *Zorn* arguably disclosed more than any source tendered here by the movants, for they identified errors in the defendants' claims, and they still fell short because they disclosed no knowledge. The SBA's database identifies no error at all. A violation is a claim presented "knowingly," with actual knowledge of its falsity, in deliberate ignorance of the truth, or in reckless disregard of it. 31 U.S.C. § 3729(b)(1)(A). No source the movants tender speaks to that element. Neither the SBA's database, nor a Form 990, nor a club's website discloses what any defendant knew when it certified its eligibility, what inquiry it made or declined to make, or what it was told and by whom. The knowing and false character of each certification is alleged in the FAC alone, and it is Relator's burden to prove it on evidence in this action. *See United States v. Woodley*, No. 24-cv-01003, 2026 U.S. Dist. LEXIS 22628, at *12-13 (N.D. Cal. Feb. 3, 2026) (publicly available PPP loan information "does not contain an explicit accusation of wrongdoing" and "simply does not disclose any allegation or transaction of fraud").

The movants' scienter arguments reinforce the point. The W&L Defendants contend that the FAC pleads no facts showing that any defendant knew its certification was false, Dkt. 128-1, at 8-11, and the Dickinson Defendants call the private club allegations too thin to support any inference of knowledge, Dkt. 130-1, at 4-5. If that is so, a public record showing that an excluded organization received a loan reveals, at most, a mistake. It does not reveal a fraud, and the bar

reaches the latter alone. The movants cannot maintain at once that the public record disclosed the fraud and that the FAC fails to plead it.

*Erskine* decided the same question under the same public data, and is the only appellate authority to do so. The relator there alleged that a mortgage lender falsely certified its PPP eligibility notwithstanding 13 C.F.R. § 120.110(b). The district court held the claim barred because the federal PPP database disclosed the loan, its forgiveness, and the borrower's NAICS industry code, from which the relator inferred ineligibility. The Ninth Circuit reversed. Assuming that the database was a federal report, because the parties there agreed that it was, 182 F.4th at 792, it held that the database did not disclose substantially the same allegations as the complaint, because the industry code "does not reveal that [defendant] was categorically ineligible to receive PPP funds," and the district court had "impermissibly assessed Relator's eligibility misrepresentation theory 'at the highest level of generality.'" 182 F.4th at 792-93 (citation omitted).

Unlike in *Erskine*, the SBA database and PandemicOversight.gov do not record the paragraph of section 501(c) under which a borrower is exempt. It records "Non-Profit Organization." The movants must reach outside the database, to the IRS, to ProPublica, for the classifications.[1] Dkt. 128-1, at 15. They may do so, for the Eighth Circuit reads qualifying sources together, *CSL Behring*, 855 F.3d at 944. But having done so, they still have marshaled only the true state of facts.

A district court in the Ninth Circuit reached the same result on the same argument on the same material facts. *United States ex rel. Craig v. Hawthorne Mach. Co.*, No. 20-cv-1625, 2024

[1] Whether the SBA's bulk loan data are a "federal report" at all remains an open question, and the movants' authority does not close it. Dkt. 128-1, at 16; Dkt. 132-1, at 8. What *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011), held to be a report was an agency's written response to a FOIA request together with the records the agency produced with it, and the Court took care to say that the attached records "do not 'becom[e]' reports, but simply are part of a report." *Id.* at 411 & n.6 (citation omitted). Whether records released without any accompanying statement of the agency are a report the Court expressly did not decide. *Id.* at 414. A database that records what the SBA did, without a word from the SBA about what any borrower said, is the case the Court reserved. The point need not be resolved, because through whatever channel the data reach the public, they disclose only the true state of facts.

U.S. Dist. LEXIS 173872 (S.D. Cal. Sept. 25, 2024). The relator there alleged that a borrower misstated its employee headcount on its PPP application, and he built the allegation in part from public records, among them the borrower's Form 5500 filed with the Department of Labor. *Id.*, at *17-18. The defendants moved to dismiss under the public disclosure bar on the ground that "the entirety of his fraud theory originated from publicly available governmental records and internet articles." *Id.*, at *32. The court denied the motion, because the relator relied on the borrower's "PPP loan application itself, which is non-public," and because the public records, however they might have helped the relator, did not themselves constitute "a direct claim of fraud" or "facts from which fraud can be inferred." *Id.*, at *37-38 (citation omitted). That is this case, as to every defendant. The FAC rests on each defendant's application, and the public loan data, tax listings, and statutes the movants assemble are the same kind of background records that *Craig* held did not trigger the bar.

Other cases have reached the same result in the same circumstances. The defendants in *United States ex rel. Relator LLC v. Tennyson*, No. 2:23-cv-05887, 2025 U.S. Dist. LEXIS 194153 (C.D. Cal. Sept. 29, 2025) argued that the loan details published on PandemicOversight.gov, read together with the PPP rule that excluded lenders, publicly disclosed the fraud. The court held that the database entry, which recorded the borrower's name, location, industry, loan amount, forgiveness amount, and reported jobs, did "not reveal facts from which a fraudulent transaction can be inferred," because the database's "vague description of [the borrower's] industry is 'so innocuous' that there can be no disclosure of a fraudulent transaction in the first instance." *Id.*, at *14-15 (citation omitted). *See also United States ex rel. Relator LLC v. iLink Emps. Co.*, No. 5:22-cv-01004, 2024 U.S. Dist. LEXIS 149130, at *12 (C.D. Cal. July 11, 2024) (data from the SBA website "provides no information from which the true state of facts can be inferred," its "disclosures

are 'so innocuous' that there can be no disclosure of a fraudulent transaction in the first instance," and "because the claim is not based upon a publicly disclosed allegation or transaction, the public disclosure bar is not triggered"), *reaffirmed on remand*, 2026 U.S. Dist. LEXIS 64374, at *12 (C.D. Cal. Mar. 20, 2026); *United States v. Baxter*, No. 23-cv-00336, 2025 U.S. Dist. LEXIS 88452, at *12-13 (N.D. Cal. May 8, 2025) ("Despite the uncontested fact that Relator's complaint is factually wrapped up in the information publicly available on PandemicOversight.gov, I conclude that this information alone simply does not disclose any allegation or transaction of fraud. Relator's False Claims Act claim is not barred by the public disclosure bar . . .").

One court has ruled on motions to dismiss directed at Relator's materially similar complaints, and it denied them. *United States ex rel. Tarbell Grp. LLC v. Bristol TN-VA Ass'n of Realtors*, No. 1:25-cv-111, Doc. 149 (E.D. Tenn. Sept. 14, 2026) ("*BTVAR*") (not yet available on Lexis) (denying thirteen motions that invoked the public disclosure bar and Rule 9(b)). The court denied the motions because the movants' materials did not establish public disclosure, but added that their evidence "suggests that there is a significant likelihood that the public-disclosure bar will apply at summary judgment," and set a schedule to decide the question on a developed record. *Id.* at 9, 11. *BTVAR* stated, in a footnote, that fraud "can be inferred if publicly available information shows" that a defendant received a loan, that it held a given section 501(c) status when it received the loan, and that organizations of that status were then ineligible. *Id.* at 8 n.6. The court had no occasion to test that proposition, because no movant proved that any of those facts had been published before suit, and it did not ask the question *Rabushka* and *Allina* make decisive in this Circuit, whether the assembled facts reveal that the defendant represented itself to be something it was not. Nor did it have the benefit of *Erskine*, which issued after the briefing there had closed, and did not cite or distinguish *Craig*, *Tennyson*, *Baxter*, or *iLink*.

The Eighth Circuit decisions invoked by the movants do not counsel public-disclosure-bar dismissal. In *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1078-79 (8th Cir. 2014), both the true and misrepresented facts appeared in enumerated sources. The relator alleged that the utility, to induce the General Services Administration to install an all-electric heating and cooling system in a federal building, (1) used a false rate projection in the life cycle cost analysis it delivered to the agency, and (2) promised the agency a discounted rate it could not lawfully give. As to (1), the rate projection, the false state of facts was a 7 percent rate increase that appeared in GSA's FOIA response. The true state of facts, the 11.5 percent increase the utility had proposed to the Missouri Public Service Commission ("PSC") a month earlier, appeared in testimony before the PSC that the court treated as news media because the commission published it through a media center it maintained. As to (2), the illusory promised discount, the false discount and the agency's reliance on it appeared in the aforementioned PSC testimony. The true state of facts, that the utility's rates were regulated and the discount was not the utility's to give, appeared in a competitor's warning letter produced in the same FOIA response. The public record held the misrepresentation and the truth side by side, and the bar applied. In *Paulos*, the Eighth Circuit inquired whether the enumerated sources disclosed both the misrepresentation and knowledge, and applied the bar because they did. 762 F.3d at 693. Here, no enumerated source discloses the misrepresentation, and the movants do not even contend that an enumerated source discloses their knowledge that their eligibility certifications were false. In *Ambrosecchia* the relator did not contest that the federal reports disclosed her claims, 855 F.3d at 954, and the decision turned on the original source exception, which is not at issue here.

*United States ex rel. Lesko v. Minn. Orchestral Ass'n*, No. 23-cv-3216, 2025 U.S. Dist. LEXIS 135122 (D. Minn. July 16, 2025) is the unpublished district court decision on which the

movants principally rely. The relator there alleged that an orchestra understated its employee count, on an application form that did not define "employee," in order to stay beneath the program's size limit, conceded that the public sources were qualifying disclosures, and waived the original source question. *Id.*, at *2, *9-11. The public availability of the application form was undisputed. The decision did not confront the question presented here, whether public data that record a loan and a tax status disclose a borrower's knowingly false certification of eligibility, and to the extent its reasoning implies that they do, it did not engage *Rabushka* or *Allina*, or any of the many other cases holding to the contrary.

The W&L Defendants open their brief, and their public disclosure argument, with the observation that the Act was enacted "to empower genuine whistleblowers, not 'opportunistic plaintiffs' like Tarbell," Dkt. 128-1, at 4, 12 (quoting *CSL Behring*, 855 F.3d at 941), and AAI adds that Relator relies on public documents "rather than insider/nonpublic information." Dkt. 131-1, at 6 n.1. The observations answer a question the statute does not ask. The "opportunistic" plaintiff *CSL Behring* describes is one who "merely feed[s] off a previous disclosure of fraud," 855 F.3d at 941 (citation omitted), which restates the bar's test, and which returns the inquiry to whether any enumerated source disclosed the fraud. The Act commissions as a relator any "person," 31 U.S.C. § 3730(b)(1), a term Congress left unqualified. Insider knowledge enters the statute at a single place, the original source exception, which is reached only after a qualifying public disclosure. Carried to its conclusion, the movants' position would confine the Act to insiders, which nothing in its text does, and *Erskine* reversed the dismissal of an action brought by a limited liability company that did not claim to be an original source. 182 F.4th at 792 n.2. A parasitic suit feeds on a fraud already exposed in an enumerated source. This suit rests on certifications that no source has exposed, on a state of mind that no source describes, and on Relator's comparison of each loan to

the eligibility rules Congress and the SBA fixed, an analysis performed by no public source and, so far as the record shows, by no defendant before it certified.

Because no qualifying public disclosure occurred, the Court need not reach the original source exception, and the movants' complaint that the FAC does not plead original source facts, Dkt. 128-1, at 18-19, puts the cart before the horse. The defendant must first show a public disclosure, *Paulos*, 762 F.3d at 692, and none has.

**2. The bar does not apply to the private-club counts for the additional reason that no enumerated source discloses clubs' membership practices.**

The bar does not apply to the private-club counts of the FAC, the third and sixth causes of action, for the additional reason that the clubs' membership criteria do not appear in any enumerated source.

Private clubs were ineligible for PPP independently of 501(c) status pursuant to 13 C.F.R. § 120.110(i) (excluding "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity"). No enumerated source disclosed the membership limits of the thirteen private-club defendants.

The club websites do not and cannot trigger the bar, because they are not enumerated sources. The W&L Defendants argue that the membership facts pleaded about Ames, KYC, and Pine Knolls came from those clubs' websites, which they characterize as "news media." Dkt. 128-1, at 17-18. The statute's enumerated sources are exclusive, *Rabushka*, 40 F.3d at 1513 n.2, and do not include business websites. *Erskine* is the only appellate court Relator is aware of that has considered whether a PPP borrower's business website constitutes the "news media." It held that it does not, because "the mere fact that information is publicly available on the internet does not mean that a website necessarily qualifies as 'news media' under the FCA," and the term "connotes a certain degree of separation between the source of the information and the medium that conveys

it." *Erskine*, 182 F.4th at 793-95. Had Congress meant to extend the bar to every channel of communication, "it would not have specified sources in the statute." *Id.* at 794. A reading broad enough to include a borrower's business website "would also arguably render other sources specified in the statute surplusage." *Id.* So "'news media' cannot reasonably encompass every website on the internet." *Id.* The court's examples fit this case. A restaurant may post its menu. A retail store may post its stock. "[A] gym may list its monthly membership rate and the exercise classes it offers." *Id.* None of that is news. And "a website that mostly contains information about the publisher of the website itself is unlikely to qualify as 'news media.'" *Id.* at 795. A club's membership page contains nothing but information about the club.

*Kraxberger* does not require a contrary result. The Eighth Circuit there held that the Missouri PSC "functions as a news organization." 756 F.3d at 1079. It reached that conclusion because the PSC operated as a news site. The PSC maintained a media center. It published a magazine. It webcast its hearings. A Missouri statute charged it with publishing matters of public interest. *Id.* None of that describes the golf clubs' membership pages.

A district court in this Circuit has read *Kraxberger* the same way. In *United States ex rel. Louderback v. Sunovion Pharms., Inc.*, 703 F. Supp. 3d 961, 971-76 (D. Minn. 2023), the defendant argued that information on its website was news media. The court disagreed. Had public availability on a website been enough, the Eighth Circuit's discussion of the commission's news gathering activities "would have been unnecessary." *Id.* at 975. *Kraxberger* therefore holds that information within the news media category "does not lose its news-media character by appearing on a website," not that "news media [is] so broad as to encompass all information on publicly available websites." *Id.* A rule that every readily accessible website is news media "would mean that mere public disclosure would trigger the bar," a result "at odds with the Act's plain structure and text."

*Id.* The court therefore held that the manufacturer's website was not news media, because the manufacturer did not function as a news organization when it posted information about its programs there. *Id.* at 975-76. The same is true of a club that posts its membership rules. Another district court in a PPP case has arrived at the same conclusion, holding that a business directory website that republished PPP borrower information was not news media. "To say that republishing business information is 'newsworthy' is a stretch," and the site "is not a newspaper, broadcast, or similar news source." *United States ex rel. Nevadans Against Fraud on the Gov't, LLC v. Terrible Herbst*, No. 2:24-cv-2277, 2026 U.S. Dist. LEXIS 44113, at *23 (D. Nev. Mar. 4, 2026) (holding that Bizpedia.com and secretary-of-state websites are not news media). *But see United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 813 (11th Cir. 2015) (treating medical clinics' websites as news media). That court has since clarified that it "did not hold in *Osheroff* that all websites are 'news media.'" *United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, 113 F.4th 1294, 1301 (11th Cir. 2024). *Louderback* considered *Osheroff* and rejected it. 703 F. Supp. 3d at 972-76.

Under *Allina*, the movants must show that an enumerated source disclosed the true state of facts before any question about disclosure of the misrepresentation arises. For the private club counts, the true state of facts is that each club limits its memberships for reasons other than capacity. FAC ¶¶ 50, 52, 69. The defendants adduce no enumerated source for that fact as to any club. Eleven of the thirteen Private Club Defendants have moved to dismiss. The FAC pleads the membership practices of each. FAC ¶¶ 12 (Ames), 13 (Appanoose), 18 (Crestmoor), 19 (Des Moines Embassy), 20 (Geneva), 23 (KYC), 27 (The Outing Club), 28 (Pine Knolls), 32 (Urbandale), 33 (Washington), 35 (Eagles Aerie). Four of the eleven are W&L Defendants: Ames, Crestmoor, KYC, and Pine Knolls. The W&L Defendants tender only websites for three of them, Ames, KYC, and Pine Knolls, and nothing for Crestmoor. Dkt. 128-1, at 17-18. The other seven movants are

the three Dickinson Defendants, Appanoose, Geneva, and two GRSM Defendants, The Outing Club and the Eagles Aerie. None of the seven identifies a source of any kind that discloses how the club admits members. The two remaining Private Club Defendants, Columbus Club Inc. and Sigma Lambda Beta International Fraternity, have neither appeared nor moved. FAC ¶¶ 17, 30. The private club theory therefore fails the first step of *Allina* on the movants' showing, whatever the Court concludes about the second. The bar therefore does not apply to the private club counts.

**B. The First Amended Complaint satisfies Rule 9(b).**

Rule 9(b) exists so that a defendant can respond to the misrepresentation charged. *Thayer*, 765 F.3d at 919. It is satisfied when the complaint identifies the who, what, when, where, and how of the alleged fraud. *United States ex rel. Simpson v. Bayer Healthcare*, 732 F.3d 869, 876-77 (8th Cir. 2013) (reversing a Rule 9(b) dismissal where the complaint identified the persons involved, the misrepresentations that induced the government contracts, the dates and manner in which they were made, and the reasons they were false). The FAC supplies each of those details for each claim. The "who" is each named defendant, whose tax classification and application address are pleaded separately. FAC ¶¶ 4-37. The "what" is that each defendant claimed government money it was ineligible to receive, in the loan amount and the forgiveness amount stated for each loan. *Id.*, ¶¶ 54, 56, 60 & table. The "when" is the approval date and the forgiveness date of each loan, set out loan by loan in the attached table, each first-draw approval preceding the date the defendant's class became eligible. *Id.* The "where" is the application submitted to the SBA through the defendant's lender. *Id.*, ¶¶ 43-44. The "how" is by certifying eligibility on the borrower application, quoted verbatim for each defendant, and again on the forgiveness application, likewise quoted and assigned defendant by defendant. *Id.*, ¶¶ 57-58, 64, 71, 76-77, 84-85, 91-92.

That is the opposite of the pleading condemned in *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006), where an anesthesiologist with no access to billing

alleged that "every" claim over sixteen years was fraudulent without identifying one. The concern driving *Joshi*'s representative-example requirement is reliability: a relator who cannot identify any claim may be speculating that claims were submitted at all. *Thayer*, 765 F.3d at 917-18. No such concern exists here. The submission of each claim is not inferred but established, by the SBA's record that the loan was approved and forgiven. No defendant denies that it applied for and received the loans attributed to it. Treynor attached its applications to its motion, Dkts. 129-1, 129-2, and the Zaputil declaration Appanoose filed recites the dates on which Appanoose applied, the amounts it received, the dates it sought and obtained forgiveness, and the name of the board member who signed. Dkt. 132-2, ¶¶ 2-5. Defendants who can recite the particulars of their claims cannot plausibly maintain that they lack notice of them.

Two courts have sustained PPP complaints of the same kind against the same attack. The Ninth Circuit held that a relator "plausibly alleges with particularity" that PPP borrowers "falsely certified certain statements in their PPP loan applications," identifying in the pleading the who, the what and how, the when, and the where. *United States ex rel. Relator, LLC v. iLink Emps. Co.*, No. 24-5636, 2025 U.S. App. LEXIS 28688, at *2-3 (9th Cir. Nov. 3, 2025) (unpublished). And the Eastern District of Tennessee rejected the same particularity attack on Relator's similar pleading in *BTVAR* (with fewer details, as Relator did not amend the complaint there). The loan table supplied the time of each misrepresentation, the eligibility certification supplied its content, and the allegation that each defendant knowingly presented a false claim supplied the intent. "Although Plaintiff's complaint is relatively short, there is nothing more to the alleged 'fraudulent scheme' here." *BTVAR*, at 11. The allegations "provide Defendants with clear notice as to the nature of Plaintiff's claims, and they state a plausible claim for relief." *Id.* The FAC here pleads more than

the complaint sustained there: the certifications are quoted by form version, the second certification on forgiveness is pleaded separately, and the private club facts are pleaded club by club.

The movants' remaining demands exceed the requirements of Rule 9(b). They fault the FAC for not naming the individual who signed each form. Dkt. 128-1, at 11-12. The "who" is the corporate applicant, which the Act reaches directly, *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 125-26 (2003). The identity of the officer who signed a defendant's form is a fact peculiarly within that defendant's knowledge, and Rule 9(b) does not require it. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432-33 (4th Cir. 2015) (reversing Rule 9(b) dismissal of a complaint that identified only corporate defendants as the makers of false certifications on government forms); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506-07 (6th Cir. 2007) ("The identity of the natural person within the corporate defendant who submitted false claims is not an essential element of a FCA violation."); *Tennyson*, 2025 U.S. Dist. LEXIS 194153, at *18-19 (sustaining a PPP complaint against argument that it failed to allege "that a specific person knowingly provided false information on its loan application"). The FAC pleads that each defendant acted through the unnamed officers who completed its forms, FAC ¶ 38. Treynor and Appanoose have now supplied the names themselves. The movants also demand that Relator plead "how Tarbell came to know" of each certification. Dkt. 128-1, at 11. That is not among the particulars *Joshi* lists, and it is a request for the relator's evidence rather than for notice of the claim.

Nor does the FAC "lump" defendants together. Where several defendants are charged with fraud, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). The FAC does so. It pleads each defendant's status and each loan separately, and it alleges the

same species of misrepresentation as to each because each made the same certification on the same government form. The rule against group pleading addresses complaints in which different actors played different parts yet the complaint asserts that "everyone did everything." *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (discussing *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011)). "On the other hand, a complaint need not distinguish between defendants that had the exact same role in a fraud." *Id.* "There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). Where the defendants' roles are identical, the complaint may say so.

The movants' Rule 9(b) arguments exceed its purpose, namely, putting defendants on notice as to the particular actions of which they stand accused and enabling them to defend. Particularity is not an end in itself. The Rule is read "in harmony with the principles of notice pleading," and "a pleading alleging fraud need not provide anything more than notice of the claim," albeit "a higher degree of notice." *Schaller*, 298 F.3d at 746 (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). A plaintiff is not required to plead its evidence. "Litigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's proof leads to windy complaints and defeats the function of Rule 8." *Bennett*, 153 F.3d at 519.

Measured against that purpose, the motions almost refute themselves with the detailed facts and theories they marshal. Each defendant knows that it applied for a PPP loan, and when, and on which form, because it filled the form out. Each knows what it certified, because the certification is printed on the form above its officer's signature. Each knows the paragraph of section 501(c)

under which it is exempt, because it reports that paragraph to the Internal Revenue Service every year. And each knows the theory of falsity, because the FAC states it in a sentence: the applicant certified that it was eligible under the rules in effect when it applied, and the rules in effect excluded it. Sixty-four pages of briefing directed at that theory, arguing that the certification was true, that it was immaterial, that ARPA made it lawful, or that the club exclusion does not reach the clubs, are not the work of parties nonplussed as to what they are accused of. No defendant is in doubt about what is afoot here, and Rule 9(b) requires nothing more. Treynor, Appanoose, and AAI have already assembled and placed before the Court applications, a declaration, articles, and tax filings bearing on the claims against them. Dkts. 129-1, 129-2, 131-2 to 131-4, 132-2. A defendant that has gathered the documents bearing on the claims against it cannot colorably contend that it does not know what those claims are.

**C. The FAC plausibly pleads scienter.**

Rule 9(b) exempts scienter from its heightened pleading requirements, and allows it to be alleged generally: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. *Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.*" (Emphasis added). And the Act does not require either specific intent to defraud or actual knowledge of falsity. 31 U.S.C. § 3729(b).

By contrast, the defendants demand now, at the pleading stage, something the Act does not demand at trial, and for a claim the FAC does not plead. The movants brief this case as though it charged common-law fraud. It does not. The Act imposes liability for presenting a "false or fraudulent" claim and for making a "false record or statement," 31 U.S.C. § 3729(a)(1)(A), (B), and the FAC alleges a false statement: a certification of eligibility by an entity the rule excluded. The mental state the Act attaches to that statement is broader than any fraud standard. "Knowingly" reaches not only actual knowledge but "deliberate ignorance" and "reckless disregard," and the

Act "require[s] no proof of specific intent to defraud." § 3729(b)(1)(A), (B). The standard is "purposefully broad," written to reach the "'ostrich-like' conduct" that Congress found "poses insurmountable difficulties for civil false claims recoveries." *United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 233 (4th Cir. 2026) (quoting S. Rep. No. 99-345, at 7 (1986)).

The FAC conforms to the Act. It does not use the word "fraud," and it does not allege that any defendant set out to deceive the SBA. The Act requires neither. The FAC rather alleges that each defendant certified a fact that was not so, on a form that told it what the fact had to be, under a one-page rule that told it the fact was otherwise, and that each did so with the knowledge the Act defines. That is the claim the Court must test, and the movants' demand for facts showing an intent to deceive tests a claim that has not been pleaded. Rule 9(b) permits that knowledge to be "alleged generally." The inquiry is subjective, and it reaches defendants "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity," and defendants "who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023). Rule 8 asks whether the pleaded facts make the inference of such knowledge plausible. "The FCA does not require scienter to be pled with specificity for good reason," because "direct proof of scienter is often unavailable," particularly "at the pleading stage before the parties have had an opportunity to engage in discovery," and "[c]ourts must not impose a higher bar for pleading scienter." *Sheldon*, 170 F.4th at 242. Since *SuperValu*, "motions to dismiss for failure to plausibly allege scienter under the FCA have overwhelmingly been denied." *Id.* at 243. And "those who deal with the Government are expected to know the law." *Id.* at 242 (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984)). The pleaded facts make the inference plausible here, for five reasons.

First, the rule that excluded each defendant was published, simple, and pointed. The SBA's first interim final rule, issued April 2, 2020, before any first-draw loan at issue was approved, answered the question "Am I eligible?" by listing, among nonprofits, only "[a] tax-exempt non-profit organization described in section 501(c)(3)" and a veterans organization described in section 501(c)(19), and answered "How do I determine if I am ineligible?" by directing every applicant to 13 C.F.R. § 120.110. 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020), §§ III.2.a, III.2.c. Section 120.110 has excluded "[n]on-profit businesses" and "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity" for decades. 13 C.F.R. § 120.110(a) & (i). Nothing about a rule that names paragraph (3) and paragraph (19) and no others was ambiguous.

The rule also directed applicants to the SBA's Standard Operating Procedure for a further description of ineligible businesses. 85 Fed. Reg. at 20812, § III.2.c. That description states that "[b]usinesses that restrict patronage for any reason other than capacity are not eligible," and gives a single-sex health club as the example. SOP 50 10 5(K), Subpart B, ch. 2, § III.A.9, at 108 (eff. Apr. 1, 2019).

The Act does not permit an applicant to certify first and read the rule later. *SuperValu* forecloses the argument in any event. FCA's scienter element "refers to respondents' knowledge and subjective beliefs," not to what an objectively reasonable person might have believed, and "facial ambiguity alone is not sufficient to preclude a finding that respondents knew their claims were false." 598 U.S. at 749. "[T]he focus is not . . . on post hoc interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim." *Id.* at 752. No defendant has offered, and none could plausibly offer, a reading of the rule under which it believed at the time that a 501(c)(5), (6), or (7) organization was "described in

section 501(c)(3).” And an asserted ambiguity is in any event a defense to be proved, not a ground for dismissal. The Fourth Circuit, reversing a dismissal, has held that ambiguity-based scienter defenses are “not generally appropriate to consider . . . at the motion to dismiss stage,” because “[t]he subjective scienter standard prevents wrongdoers from taking advantage of arguable ambiguity in a statute to exploit the public fisc for private gain.” *Sheldon*, 170 F.4th at 245.

Second, the application form told each applicant the same thing on its face. Its first line directs the applicant to “Check One” among the entity types the program contemplated, and the only nonprofit boxes offered are “501(c)(3) nonprofit” and “501(c)(19) veterans organization.” Dkt. 129-1, at 1. Every defendant in this case had to confront that menu and find no category of eligible nonprofit that described it. Treynor’s president checked the 501(c)(3) box and wrote a “7” over the printed “3.” *Id.* Treynor offers the exhibit as proof that it “did not misrepresent its 501(c)(7) status.” Dkt. 129, at 2. It proves something else: that the applicant read the form, understood that the program’s stated categories of eligible nonprofits did not include it, and certified eligibility anyway. A person who alters a government form to fit an entity the form does not contemplate is, at the least, “aware of a substantial risk” that the certification on the next page is false. *SuperValu*, 598 U.S. at 751. Treynor will say the alteration shows candor rather than knowledge, an applicant that hid nothing. Perhaps a factfinder will agree. But the exhibit bears both readings, and the choice between them, whether an applicant that saw the form did not fit it was disclosing a discrepancy or disregarding one, is a question of fact about Treynor’s state of mind that Rule 12(b)(6) does not permit the Court to resolve against the pleader and that Rule 9(b) does not require Relator to plead with particularity. That Treynor must ask the Court to draw the inference in its favor answers its motion. Treynor’s exhibit is properly before the Court because, as Treynor says,

the application is embraced by the FAC. Dkt. 129, at 2 n.1. The same form, with the same menu, was completed by every other defendant that applied in 2020.

Third, the certification was not buried. It appears under the heading "By Signing Below, You Make the Following Representations, Authorizations, and Certifications," begins with the applicant's certification that "I have read the statements included in this form . . . and I understand them," and is followed by a separately initialed certification that the information provided "is true and accurate in all material respects," under a warning that a knowingly false statement is punishable by imprisonment. Dkt. 129-1, at 2; FAC ¶¶ 43, 57. An applicant that certifies it has read and understood the rules, and certifies its eligibility under them, has either read the rules or has not. If it has, it knew, for the rule listed the eligible nonprofits by paragraph and admitted of no misreading. If it has not, it certified in deliberate ignorance of what a one-page rule would have told it. Either satisfies section 3729(b)(1).

Fourth, each defendant certified twice. On its forgiveness application it certified anew its compliance with the program rules or the truth and accuracy of its submission, FAC ¶¶ 76-77, 84-85, 91-92, and the form advised it that the SBA could direct denial of forgiveness "if SBA determines that the Borrower was ineligible for the PPP loan." *Id.*, ¶¶ 78, 86, 93. The forgiveness application thus put eligibility squarely before the applicant a second time, months after the first, and each defendant certified again rather than inquire.

Fifth, as to the Private Club defendants, the pertinent facts lay within each club's knowledge. A club knows whether it admits members by sponsorship and board vote, charges an initiation fee, restricts its dining room to members and their guests, or ties membership to shareholding. FAC ¶¶ 12-13, 17-20, 23, 27-28, 30, 32-33, 35. The exclusion of "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity" was the rule

to which the interim final rule directed every applicant, and it required no legal training to apply to, for example, a club that describes itself as "Ames' Only Private Club Community." *Id.*, ¶ 12.

The movants' authorities do not hold otherwise. *Ambrosecchia* rejected a relator's argument that she was an original source because her information "materially adds" to public disclosures by demonstrating scienter, and observed that her complaint alleged nothing about scienter beyond the word "knowing." 855 F.3d at 955. The FAC here does not plead that Relator is an original source, rendering *Ambrosecchia* of dubious relevance. It does, however, plead the rule, the form, the certification, the second certification, and the club facts recited above. *Strubbe*, 915 F.3d at 1167-68, on which the movants rely for the proposition that Eighth Circuit precedent requires dismissal, addressed whether a hospital knew that two employees had engaged in protected activity for purposes of a retaliation claim under section 3730(h). It does not address pleading a defendant's knowledge that its claim was false. *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 413 & n.2 (8th Cir. 2012), and *Thayer*, 11 F.4th at 938-40, affirmed summary judgments entered after discovery on evidentiary records, not dismissals on the pleadings. And *United States ex rel. Henig v. Amazon.com, Inc.*, 177 F.4th 156 (2d Cir. 2026), concerned whether a retailer could be charged with knowledge that its foreign suppliers were underpaying customs duties, a question of one party's knowledge of another's misconduct with no counterpart here, where each defendant certified its eligibility.

Appanoose adds a declaration from an officer stating that it consulted its bank and its accountant. Dkt. 132-2, ¶ 5. The declaration is testimony, not a document embraced by the pleading, and the Court must exclude it or convert the motion under Rule 12(d) and afford Relator discovery. Fed. R. Civ. P. 12(d), 56(d). Taken as it stands, it does not compel dismissal as to Appanoose. Reliance on advisers is a defense to be proved, not a pleading defect, and the declaration does not

say that anyone so much as investigated or read the eligibility rule. Nor does Treynor's disclosure of its status to its lender make its false certification of eligibility true. The lender's underwriting obligation was "limited to the items above and reviewing the Paycheck Protection Application Form," and the SBA held lenders harmless for relying on borrower attestations. 85 Fed. Reg. at 20816, §§ III.3.b, III.3.c. The program ran on the borrower's certification. That is why the certification was required, and why a false one is actionable.

### D. The FAC pleads materiality, and the SBA's approval and forgiveness of the loans do not defeat it.

A misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The government's decision "to expressly identify a provision as a condition of payment is relevant," and the question is whether the misrepresentation went to "the essence of the bargain" rather than to "minor or insubstantial" noncompliance. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193-94 & n.5 (2016). The FAC pleads that the eligibility certification was required as "a material prerequisite" to every loan and every forgiveness, and that without it no loan would have issued and no forgiveness would have been granted. FAC ¶¶ 43-44, 59, 65, 79, 87, 94.

Eligibility was not a peripheral condition of the PPP. It was the threshold of the program, necessary to comply with the legislation that established the program. The movants' position, reduced to its substance, is that the SBA would have guaranteed, and then forgiven, every one of the fifty-three loans at issue, in whatever amount each applicant requested, to organizations that, instead of certifying eligibility, refused to certify on their applications that they were eligible. The certification was an absolute prerequisite, and failure to certify an automatic disqualification. On remand in *Escobar*, the First Circuit found materiality adequately pleaded for three reasons that apply here in every relevant aspect: compliance was a condition of payment, it went to the essence

of the bargain, and there was no allegation that the government paid with actual knowledge of the violation. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110-11 (1st Cir. 2016). The Eighth Circuit has distinguished this kind of claim, a false application to establish initial eligibility for a federal program, from the mundane regulatory noncompliance beyond the Act's reach. *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 797 (8th Cir. 2011) (distinguishing *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005), and *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)).

The argument that approval and forgiveness prove immateriality mistakes success by the perpetrator for acceptance by the victim. *Escobar* holds that continued payment supports an inference of immateriality where the government pays "despite its actual knowledge that certain requirements were violated." 579 U.S. at 195. Access is not actual knowledge. Nor is awareness of an allegation, for "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance," and a relator is not required "at the Motion to Dismiss phase to learn, and then to allege, the government's payment practices" to establish materiality. *Escobar*, 842 F.3d at 111-12. The Dickinson Defendants say the SBA had "access" to their tax status, Dkt. 130-1, at 5-6, and Appanoose says the information "was publicly available and accessible to the government," Dkt. 132-1, at 10. Neither alleges that the SBA knew any defendant was ineligible when it guaranteed or forgave a loan. The SBA, which guaranteed approximately 11.8 million PPP loans, 89 Fed. Reg. 68090, 68091 n.2 (Aug. 23, 2024), relied on the certifications it required precisely because it could not investigate each applicant. A program that dispenses with independent verification and rests eligibility on the borrower's certification makes that certification more important, not less. *United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017), on which both rely, reversed a jury verdict on a full trial record showing

that the agency had investigated, knew every fact, and continued to pay. Nothing of that nature is alleged here.

Nor has the government "signaled no change in position." *Escobar*, 579 U.S. at 195. It has pursued private clubs and section 501(c)(7) organizations for this misrepresentation and recovered. *See, e.g.,* Press Release, U.S. Attorney's Office for the Western District of New York, The Buffalo Club Agrees to Pay $1.5 Million to Resolve False Claims Act Allegations Related to Paycheck Protection Program Loan Eligibility (Apr. 17, 2026), https://www.justice.gov/usao-wdny/pr/buffalo-club-agrees-pay-15-million-resolve-false-claims-act-allegations-related (club that "restricted membership for reasons other than capacity"); Press Release, U.S. Attorney's Office for the District of Columbia, Maryland Country Club Agrees to Pay Over $1 Million to Resolve False Claims Act Allegations of Improper Receipt of Paycheck Protection Program Loan (Apr. 6, 2026), https://www.justice.gov/usao-dc/pr/maryland-country-club-agrees-pay-over-1-million-resolve-false-claims-act-allegations (section 501(c)(7) club, $1,042,500); Press Release, U.S. Attorney's Office for the Eastern District of Wisconsin, University Club of Milwaukee Agrees to Pay Over $1 Million to Resolve Claim that It Wrongfully Obtained Paycheck Protection Program Loan (Dec. 13, 2024), https://www.justice.gov/usao-edwi/pr/university-club-milwaukee-agrees-pay-over-1-million-resolve-claim-it-wrongfully (club that "limited its membership for reasons other than capacity"). A requirement the United States enforces by suit against those who evaded it is not one the United States regards as immaterial. *See Craig*, 2024 U.S. Dist. LEXIS 173872, at *28-29 (forgiveness of a PPP loan "not . . . dispositive of materiality or scienter" absent actual knowledge).

Finally, the Dickinson Defendants offer the United States' declination as evidence of immateriality. Dkt. 130-1, at 6. The Eighth Circuit has held, in the case the movants cite for their Rule 9(b) standard, that "the government's decision not to intervene in a relator's case is of

minimal significance when determining whether an alleged violation is material." *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, 115 F.4th 908, 919 (8th Cir. 2024). The Act contemplates that a relator will conduct a declined action, 31 U.S.C. § 3730(c)(3), and most qui tam actions proceed in exactly that posture. "The government's failure to intervene on any or all claims does not mean that the claims lack merit (or that the government thinks that they do)," for "[t]he decision to intervene can turn on 'any number of reasons,'" and the movants do not know, and cannot know, what investigation the United States Attorney's Office undertook or what resources it could devote to an action against thirty-four defendants. *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1077 (N.D. Cal. 2020) (citation omitted). *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424-25 (2023).[2]

**E. The American Rescue Plan Act did not retroactively validate the defendants' certifications, and it preserved the private club exclusion.**

The Dickinson Defendants and Appanoose contend that because ARPA made 501(c)(7) organizations eligible for "covered loans" during the "covered period," Congress "retroactively expanded" eligibility to every loan at issue, and that the later-enacted statute "controls over" the private club exclusion in 13 C.F.R. § 120.110(i). Dkt. 130-1, at 4-6; Dkt. 132-1, at 11-12. The statute refutes both propositions.

ARPA was enacted on March 11, 2021. Section 5001(a) amended section 7(a)(36) of the

[2] Were an inference from the government's election permissible, it would favor Relator. The United States has intervened in materially identical actions filed by Relator against tax-exempt organizations that certified PPP eligibility before their categories were admitted to the program, and those actions have produced more than twenty-five settlements with a value exceeding $7.5 million. *See, e.g.*, Press Release, U.S. Attorney's Office for the District of Massachusetts, Labor Union Agrees to Pay $2 Million to Resolve Allegations of PPP Loan Fraud (Sept. 17, 2025), https://www.justice.gov/usao-ma/pr/labor-union-agrees-pay-2-million-resolve-allegations-ppp-loan-fraud (501(c)(5) union, $2,033,205); Press Release, U.S. Attorney's Office for the District of Columbia, Six Non-Profits Agree to Pay Over $3 Million to Resolve False Claims Act Allegations Involving Paycheck Protection Program Loans (Sept. 24, 2025), https://www.justice.gov/usao-dc/pr/six-non-profits-agree-pay-over-3-million-resolve-false-claims-act-allegations-involving (five 501(c)(4) organizations and one 501(c)(3) organization ineligible for a second-draw loan, $3,106,461).

Small Business Act by adding a definition of "additional covered nonprofit entity," meaning an organization described in a paragraph of section 501(c) "other than paragraph (3), (4), (6), or (19)," and by providing that such an entity "shall be eligible to receive a covered loan if" it satisfies four conditions concerning lobbying receipts, lobbying activities, lobbying expenditures, and employee headcount. Pub. L. No. 117-2, § 5001(a)(1), 135 Stat. 4, 82-83 (2021). Nothing in section 5001 purports to apply to loans already made, to validate certifications already given, or to forgive ineligibility already incurred. A statute that first makes a class eligible on March 11, 2021 cannot make true a certification, given in April 2020, that the applicant was eligible "under the rules in effect at the time this application is submitted."

The presumption against retroactivity, which requires a clear statement before a statute is read to alter the legal consequences of completed conduct, forecloses the movants' interpretation. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 280 (1994). The SBA read the statute the same way. Its implementing rule provides that the ARPA changes "apply to PPP loans approved, and loan forgiveness applications submitted, on or after March 11, 2021." 86 Fed. Reg. 15083, 15084 (Mar. 22, 2021). Every first-draw loan at issue was approved before that date. FAC, table.

The movants' theory of harmless retroactivity is also counterfactual. A worker who begins collecting Social Security a year before reaching the eligibility age cannot answer that no harm was done because he became eligible the following year. The money was paid when it should not have been. Someone else's claim went unpaid in the meantime. That is what happened here. The Program's initial $349 billion was exhausted on April 16, 2020, thirteen days after lending began. Cong. Rsch. Serv., R46397, *SBA Paycheck Protection Program (PPP) Loan Forgiveness: In Brief* 1 (updated Oct. 6, 2021), https://www.everycrsreport.com/files/2021-10-06_R46397_b8bffb6c23a4c616f2dd41d1176bcf48dfbcef12.pdf. Congress appropriated another

$310 billion eight days later. Pub. L. No. 116-139, § 101(a), 134 Stat. 620, 620 (2020). In December 2020 Congress funded a second round, raising the total program level to $806.45 billion. 86 Fed. Reg. 3692, 3693, 3695 (Jan. 14, 2021). The general fund was exhausted again on May 4, 2021. U.S. Gov't Accountability Off., GAO-21-601, *Paycheck Protection Program: Program Changes Increased Lending to the Smallest Businesses and in Underserved Locations* 5 (Sept. 2021), https://www.gao.gov/assets/gao-21-601.pdf. The SBA's Inspector General estimates that $64 billion of the nearly $800 billion disbursed went to potentially fraudulent PPP loans. SBA Off. of Inspector Gen., Report 23-09, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* 1, 8 (June 27, 2023), https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape. Every dollar an ineligible applicant drew in April 2020 was a dollar unavailable to an eligible applicant before the fund ran dry. Eligibility conferred eleven months later does not restore it.

The two second-draw loans to moving defendants approved after March 11, 2021, to Ames on March 27, 2021 and to AAI on May 25, 2021, were unlawful on an independent ground that ARPA did not touch. The SBA's second-draw rule, in effect before either was approved, provided that "[a]n entity that is ineligible to receive a First Draw PPP Loan under the CARES Act or Consolidated First Draw PPP IFR is also ineligible for a Second Draw PPP Loan." 86 Fed. Reg. 3712, 3715 (Jan. 14, 2021). The rule that implemented ARPA carried the requirement forward: an applicant is eligible for a second draw only if it "[p]reviously received a First Draw PPP loan in accordance with the eligibility criteria in the Consolidated First Draw PPP IFR (as amended)." 86 Fed. Reg. at 15087, § (c)(1)(i). The parenthetical "as amended" refers to the first-draw rule as a document, which the SBA amended repeatedly, and the criteria with which receipt of a first draw must have accorded are the criteria in force when it was received. A loan received in April 2020 was

received in accordance with the April 2020 criteria or it was not, and no amendment made in March 2021 can alter what happened in April 2020. The amended first-draw rule, moreover, carried forward the section 120.110 exclusions, so that a private club's first draw would not have accorded with the amended criteria either. FAC ¶¶ 53, 63-64. The "covered period" on which the movants rely defines the window during which loans could be made under the program. It is not a grant of eligibility to everyone who applied during the window, and reading it that way would make the eligibility criteria Congress enacted in December 2020 and March 2021 meaningless.

The movants' second proposition is still less persuasive. In the same sentence that defined the newly eligible class, Congress provided that an "additional covered nonprofit entity" "does not include any entity that, if the entity were a business concern, would be described in section 120.110 of title 13, Code of Federal Regulations . . . other than a business concern described in paragraph (a) or (k) of such section." Pub. L. No. 117-2, § 5001(a)(1)(A)(iii), 135 Stat. at 82 (codified at 15 U.S.C. § 636(a)(36)(A)(xvii)(II)). Paragraph (a) of section 120.110 is the nonprofit exclusion, which ARPA necessarily lifted for the entities it admitted. Paragraph (i), the private club exclusion, is not excepted. Congress thus wrote the private club exclusion into the definition of the class ARPA made eligible. Far from being displaced by the "specific, later-enacted expansion," Dkt. 130-1, at 5, the exclusion was expressly carried forward by it. The argument that ARPA would be "largely meaningless" if section 120.110(i) continued to apply, *id.*, at 4-5, is an argument that Congress meant something other than what it clearly wrote. Many 501(c)(7) organizations do not limit membership for reasons other than capacity, and those became eligible on March 11, 2021, subject to the lobbying and headcount conditions. Those that do limit membership for such reasons never did. The FAC alleges that the Private Club defendants fall in the second group. FAC ¶¶ 50, 52, 69, 72.

**F. The FAC pleads the private club theory with specificity.**

The Dickinson Defendants call the private club allegations "generalized descriptions" that describe "ordinary features of 501(c)(7) social clubs." Dkt. 130-1, at 4. The regulation asks whether an entity is a private club or business "which limit[s] the number of memberships for reasons other than capacity." 13 C.F.R. § 120.110(i). The FAC pleads, as to each of the three, facts that answer that question.

The Des Moines Embassy Club admits members only on sponsorship by a current member and payment of an initiation fee, reserves its clubhouse and dining rooms to members and their guests, and maintains reciprocal arrangements with other private clubs. FAC ¶ 19. Urbandale's membership is invitation-only, carries a $2,000 initiation fee, and is obtained by inquiry to the club rather than open purchase. *Id.*, ¶ 32. Washington is member- and stockholder-owned, ties membership to its shareholding structure, and limits non-member residents of the town to three rounds a year. *Id.*, ¶ 33. Sponsorship, invitation, initiation fees, and shareholding are limits on membership, and none is a function of the capacity of a dining room or a golf course.

Moreover, whether a given club's limits are in fact capacity-based is a question of fact for discovery, not a ground for dismissal. That such features are common among 501(c)(7) clubs is precisely why Congress, when it admitted 501(c)(7) organizations in 2021, took care to exclude those described in section 120.110. The Dickinson Defendants' argument that the FAC "fails to mention any legal standard," Dkt. 130-1, at 4, overlooks paragraph 50, which pleads that the program "at all times excluded Private Clubs from eligibility," and paragraph 12, which defines the term in the words of the regulation. Scienter as to this theory is addressed in Part IV.C above.

**G. AAI's tax classification is a disputed fact that cannot be resolved on this motion.**

AAI argues that it is, and always has been, a 501(c)(6) organization rather than the 501(c)(5) organization the FAC alleges, and that as a 501(c)(6) organization it was eligible when

its first-draw loan was approved on January 30, 2021. Dkt. 131-1, at 5-7.

The FAC's allegation is not conjecture. According to the IRS, AAI has been a 501(c)(5) since at least 1966, as detailed below. AAI's federal return for the fiscal year that ended on September 30, 2020, four months before AAI applied, in which AAI described itself to the Internal Revenue Service, under penalty of perjury, as a 501(c)(5) organization, a fact AAI concedes. *Id.*, at 6. AAI calls that a mistake, which it says it discovered and corrected on later returns. *Id.* The public record says otherwise. AAI's returns for the fiscal years ending September 30, 2019, 2020, and 2021, each signed by its chief financial officer, each identify AAI as a 501(c)(5) organization, and the second of them was signed on February 8, 2021, nine days after the SBA approved the loan AAI now says it was eligible to receive as a 501(c)(6) organization. The third was signed on January 13, 2022, after AAI had applied for and received its second-draw loan and after it had sought forgiveness of the first. IRS, Tax Exempt Organization Search, Copies of Returns, EIN 42-0894536, https://apps.irs.gov/app/eos (visited Sept. 22, 2026).

The first return on which AAI called itself a 501(c)(6) organization is the one it attaches, for the fiscal year ending September 30, 2023. Dkt. 131-4, at 1. Three consecutive sworn statements of the same fact, the last two made while AAI was drawing on the program, do not wear the appearance of a clerical error. Perhaps they were mistaken. But a defendant's assertion that its sworn description of itself was mistaken is a factual contention, and a Rule 12(b)(6) motion is not the vehicle for resolving it. The articles of merger and restated articles AAI attaches recite that the corporation was organized under section 501(c)(6). Dkt. 131-2; Dkt. 131-3. What AAI's incorporators wrote in 1993 and 2003 about the section under which they meant to organize does not establish how the Internal Revenue Service has classified AAI, and AAI, which has been exempt for decades, produces no determination letter. An organization's status under section 501(c) turns

on what it is and on what the Internal Revenue Service has recognized it to be. It is not changed by checking a different box on a later return, and the box AAI checked for three consecutive years, including the year it applied, was paragraph (5).

The Internal Revenue Service's recognition is a matter of public record as well, and it agrees with the returns, not with AAI's motion. Its Exempt Organizations Business Master File, its register of the organizations it recognizes as exempt, lists AAI under subsection 05, that is, section 501(c)(5), with a ruling date of January 1966, and it does so today. IRS, Exempt Organizations Business Master File Extract, Iowa, EIN 42-0894536, https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf (visited Sept. 22, 2026). AAI has been a 501(c)(5) organization in the eyes of the agency that administers section 501(c) for sixty years, and nothing it has filed suggests that it ever asked the Service to reconsider. The Form 990 AAI attaches is for a fiscal year ending September 30, 2023. Dkt. 131-4, at 1. Judicial notice extends to facts "not subject to reasonable dispute," Fed. R. Evid. 201(b), and to the existence and contents of public records, not to the truth of contested characterizations drawn from them. Whether AAI was described in paragraph (5) or paragraph (6) when it certified eligibility is disputed on the face of AAI's filings, and the dispute must be resolved on evidence.

AAI's argument also assumes that any 501(c)(6) organization was eligible on December 27, 2020 without more. It was not. The Economic Aid Act admitted 501(c)(6) organizations only if the organization received not more than 15 percent of its receipts from lobbying, devoted not more than 15 percent of its activities to lobbying, spent not more than $1,000,000 on lobbying in its most recent tax year ending before February 15, 2020, and employed not more than 300 people. Pub. L. No. 116-260, div. N, § 318, 134 Stat. 1182, 2013 (2020) (codified at 15 U.S.C. § 636(a)(36)(D)(vii)(I)). AAI, which describes itself as "the largest state agribusiness association

in the United States," Dkt. 131-1, at 3, says nothing in its brief about its lobbying. Those facts lie within AAI's knowledge, not the pleadings, and they cannot support dismissal.

**H. The omission of two docket papers from service packets does not warrant dismissal.**

AAI, joined by the W&L Defendants, Geneva, and Treynor, moves under Rule 12(b)(4) because the packets served on the defendants contained the summons, the Complaint, and a letter, but not copies of the Court's February 23, 2026 order and the government's notice of declination, which the order directed Relator to serve with the Complaint. Dkt. 131-1, at 7-8; Dkt. 10, ¶ 3. Relator does not dispute that the packets AAI and Geneva attach omitted the two docket papers. The omission was an oversight, and Relator apologizes to the Court and to the defendants for it. It does not warrant dismissal, for four reasons.

First, the omission is not a defect in process. Process under the Federal Rules consists of the summons and the complaint. Fed. R. Civ. P. 4(c)(1). Rule 12(b)(4) addresses the form of the summons, and no movant identifies any defect in the summons or in the manner of its service. AAI acknowledges that both were served on it within the ninety days the order allowed, Dkt. 131-1, at 8, and no movant contends otherwise.

Second, the omission has been cured. Relator has served both papers by a notice filed in the ECF system, Dkt. 137, with the papers attached, which serves every defendant that has appeared. Fed. R. Civ. P. 5(b)(2)(E). It is difficult to credit that the omission worked any hardship in the meantime. The two papers are docket entries in this case, Dkts. 9 and 10. They have been on the public docket since the day the case was unsealed, every movant retrieved from that same docket the Complaint it moves against, and AAI recites the contents of both papers in its motion. Their purpose, to inform the defendants that the action had been unsealed and that the United States had declined to intervene, was served long ago, and no movant claims prejudice.

Third, the remedy for a curable irregularity in service is to permit cure, not to dismiss, and cure has occurred.

Fourth, the dismissal AAI seeks would be without prejudice, Dkt. 131-1, at 8, and would accomplish nothing but the refiling of the same claims against the same defendants, this time accompanied by two documents the defendants already have. Rule 1 disfavors that result.

**I. The defendants are properly joined, joint adjudication of their identical motions is the economical course through the pleading stage, and misjoinder would not be a ground for dismissal in any event.**

AAI, again joined by the W&L Defendants, Geneva, and Treynor, contends that the defendants have "no connection to one another" and must be dropped under Rule 21. Dkt. 131-1, at 8-9. Rule 20(a)(2) permits joinder of defendants where the claims against them arise out of "the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A), (B).

The second requirement is satisfied beyond dispute, and the pending motions are the proof. Thirty defendants, represented by eight law firms, filed six motions and two joinders that adopt one another and raise the same questions of law: which classes of tax-exempt organization were eligible and when, what the certification meant, whether it was material, whether the SBA's second-draw rule disqualified a borrower whose first draw was unlawful, what the private club exclusion requires, whether ARPA had retroactive effect, and whether the public data disclosed anything. A single resistance answers all of them.

The first requirement is satisfied as well. The Eighth Circuit reads "transaction" flexibly: it "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship," so that "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence," and "[a]bsolute identity of all events is unnecessary." *Mosley v. Gen.*

*Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974). *Mosley* held that ten employees alleging separate acts of discrimination were properly joined because each act flowed from "the same general policy," *id.* at 1333-34, following *United States v. Mississippi*, 380 U.S. 128, 142-43 (1965), which sustained the joinder of six county registrars who had acted separately against separate applicants because their conduct formed part of one state-wide system. The requirement "is not a rigid test and is meant to be 'read as broadly as possible whenever doing so is likely to promote judicial economy.'" *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 622 (8th Cir. 2010) (quoting 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1653, at 415 (3d ed. 2001)).

The claims here arise from a single federal program administered under one set of rules during one fifteen-month window, and each rests on the same certification, in the same words, on the same government form. *DIRECTV, Inc. v. Loussaert*, 218 F.R.D. 639 (S.D. Iowa 2003), on which AAI relies, involved a broadcaster's claims against seven individuals who had each, for private purposes, bought a device to pirate its signal, with no common question beyond the statute sued under. *Id.*, at 642-43. The Eastern District of Virginia order AAI attaches, Dkt. 131-6, was entered sua sponte, before any defendant had appeared, in a single paragraph resting in part on that district's local rule of divisional venue, which has no counterpart here, and contains no analysis of Rule 20.

Whatever the ultimate structure of the case for discovery and trial, joint adjudication is the only sensible course through the pleading stage. Rule 20 exists to "promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." *Mosley*, 497 F.2d at 1332-33. That purpose is served most fully now, when the defendants' positions are not merely similar but identical: every motion rests on the same statute, the same regulation, the same form, and the same certification, and each movant has adopted the others' arguments by joinder.

Severance at this stage would convert one motion practice into as many as thirty, each requiring a separate resistance, a separate reply, and a separate ruling on the same ten questions, with the attendant risk that the same regulation would receive inconsistent constructions in cases assigned to different judges. That some defendants "may later present different factual and substantive legal defenses . . . does not defeat, at this stage of the proceedings, the commonality in facts and legal claims that support joinder." *Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332, 344 (D.D.C. 2011).

This Court has declined to sever where severance "will result in delay, inconvenience, or added expense," and has recognized that a court is "better positioned" to consider separating proceedings "when discovery is complete and the parties' dispositive motions, if any, have been resolved." *Atain Specialty Ins. Co. v. 3G Homes, LLC*, No. 4:19-cv-00267-RGE-HCA, 2020 U.S. Dist. LEXIS 248606, at *6, *11 (S.D. Iowa June 8, 2020) (quoting 7 Wright et al., *supra*, § 1689). Nothing is lost by proceeding in that order. Rule 21 permits the Court to sever "at any time, on just terms," and the concerns the movants raise about proof and confusion at trial, Dkt. 131-1, at 9, are addressed by separate trials under Rules 20(b) and 42(b), not by dismissal. No defendant has moved to sever. Relator recognizes that the calculus may change once the legal questions common to every defendant have been resolved and the case turns to the facts of each loan. Should the motions be denied, Relator likely would not oppose any defendant's motion to sever under Rule 21, may move for severance on its motion, and in all events will confer with the defendants on the structure of the case before the Rule 16 conference.

Even were the Court to find joinder improper, Rule 21 forbids dismissal on that ground: "Misjoinder of parties is not a ground for dismissing an action." The rule permits the Court, "on just terms," to "add or drop a party" or to "sever any claim against a party," *id.*, and the two

remedies differ in their consequences. A severed claim proceeds as a separate action in which "[t]he statute of limitations is held in abeyance, and the severed suit can proceed so long as it initially was filed within the limitations period." *DIRECTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006). Dropping a defendant, by contrast, dismisses the claim without prejudice and leaves the plaintiff to begin again, and the discretion to do so "is abated when it 'prejudic[es] any substantial right' of plaintiffs, which includes loss of otherwise timely claims if new suits are blocked by statutes of limitations." *Id.* at 846-47. The Eighth Circuit has adopted that rule and held that a district court abused its discretion by dropping misjoined parties where dismissal exposed timely claims to a limitations defense. *Strandlund v. Hawley*, 532 F.3d 741, 745-46 (8th Cir. 2008). The first-draw loans at issue were largely approved in April and May 2020, more than six years ago, 31 U.S.C. § 3731(b)(1), and a qui tam action refiled from scratch must be filed under seal and served on the United States for a new period of investigation and election under § 3730(b)(2), a burden on the government and the Court that severance avoids.

**J. Dismissal with prejudice and an award of fees would be unwarranted.**

Because the FAC states claims upon which relief can be granted, the question of prejudice does not arise. Were the Court to find any deficiency, leave to amend is to be given "freely . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and denial is warranted only for reasons such as undue delay, bad faith, repeated failure to cure, undue prejudice, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). No movant attempts to show futility beyond repeating its merits arguments, and the particulars the movants posit as missing are of the kind an amendment readily supplies.

Appanoose and the Dickinson Defendants also request attorney fees, Dkt. 130-1, at 6; Dkt. 132-1, at 13, without mentioning the statute that governs them. A prevailing defendant in a declined qui tam action may recover fees only upon a finding that the action "was clearly frivolous,

clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4). Such awards are "reserved for rare and special circumstances." *United States v. Hodges*, No. 2:22-cv-05200, 2026 U.S. Dist. LEXIS 33806, at *2 (C.D. Cal. Jan. 20, 2026) (citation omitted) (denying fees to PPP defendants who had prevailed on the public disclosure bar). Neither movant attempts that showing, and none could be made on a record in which the United States has successfully prosecuted, and consented to Relator prosecution of, dozens of settlements of the same claim. The courts that have considered the theory of this action have sustained it against the attacks the movants repeat: the Eastern District of Tennessee against thirteen motions, *BTVAR*, Doc. 149, the Ninth Circuit in *Erskine* and *iLink*, and the district courts in *Craig*, *Tennyson*, and *Baxter*. *See* Parts IV.A and IV.B above.

The theory rests on the text of two public laws. *See* Part IV.E above. The United States, which reserved the right to intervene and to seek dismissal of this action, Dkt. 9, at 2, has done neither. It intervened to negotiate and sign twenty of the settlements just mentioned, and it has announced settlements of the same claim, in actions Relator did not bring, with a section 501(c)(5) labor union, a section 501(c)(9) association, a private club that limited its membership for reasons other than capacity, and three section 501(c)(7) country clubs, most recently last month.[3] *See* Part

[3] Press Release, U.S. Department of Justice, Michigan Nonprofit Organizations Agree to Pay $225,887 to Settle False Claims Act Allegations (Mar. 13, 2023), https://www.justice.gov/opa/pr/michigan-nonprofit-organizations-agree-pay-225887-settle-false-claims-act-allegations (section 501(c)(5) labor union and section 501(c)(9) voluntary employees' beneficiary association); Press Release, U.S. Attorney's Office for the Eastern District of Wisconsin, Ozaukee Country Club Agrees to Pay $750,000 to Settle Alleged False Claims Act Violations regarding Paycheck Protection Program Loan (July 22, 2026), https://www.justice.gov/usao-edwi/pr/ozaukee-country-club-agrees-pay-750000-settle-alleged-false-claims-act-violations (club that "limited its membership for reasons other than capacity"); Press Release, U.S. Attorney's Office for the District of Columbia, California Country Club Agrees to Pay $850,000 to Resolve False Claims Act Allegations of Improper Receipt of Paycheck Protection Program Loan (July 31, 2026), https://www.justice.gov/usao-dc/pr/california-country-club-agrees-pay-850000-resolve-false-claims-act-allegations-improper (section 501(c)(7) club); Press Release, U.S. Attorney's Office for the District of Columbia, Country Club Agrees to Pay Over $1 Million to Resolve False Claims Act Allegations of Improper Receipt of Paycheck Protection Program Loan (Aug. 20, 2026), https://www.justice.gov/usao-dc/pr/country-club-agrees-pay-over-1-million-resolve-false-claims-act-allegations-improper (section 501(c)(7) club, $1,047,991). The third section 501(c)(7) club, Woodholme Country Club, is cited in Part IV.D above.

IV.D and note 2 above. A claim of the type the United States pursues, settles, and publicizes, and that courts have sustained, was not brought to harass.[4]

**V. Conclusion**

The FAC identifies every claim with particularity, pleads falsity against a rule that named the eligible nonprofits and no others, pleads scienter under the Act's definition of "knowing" and the subjective standard of *SuperValu*, and pleads materiality under *Escobar*. No enumerated source publicly disclosed any defendant's certification of eligibility, and the only appellate authority on point rejects the movants' theory. ARPA neither reached back to validate the defendants' certifications nor displaced the private club exclusion it expressly preserved. The service and joinder objections identify no prejudice and do not warrant dismissal. Relator respectfully requests that the Court deny each of the motions to dismiss, Dkts. 128 through 135, in its entirety. Should the Court dismiss any claim, Relator requests leave to amend.

Respectfully submitted,

*/s/ Alan Ostergren*

Alan R. Ostergren
Alan R. Ostergren, P.C.
500 East Court Avenue, Suite 420
Des Moines, IA 50309
alan.ostergren@ostergrenlaw.com
515-207-0134

*/s/ Bruce Ellis Fein*

Bruce Ellis Fein
Bruce Ellis Fein PLLC
Pro hac vice
P.O. Box 506
Great Falls, VA 22066
bruce@newdream.net
703-248-0390

*Attorneys for Relator The Tarbell Group, LLC*

[4] The W&L Defendants deride Relator as an "opportunistic plaintiff." Dkt. 128-1, at 4, 12. The insult is neither legally relevant nor correct. Congress funded the Program for the small businesses and the charities the pandemic had closed, and the SBA published, before any loan at issue was approved, the rule that told a trade association, a labor union, a cemetery association, a fraternal lodge, and a private club that the Program was not for them. *See* Part IV.C above. Each defendant read the certification of eligibility, signed it, took its loan, certified its eligibility a second time to have the loan forgiven, and kept more than $3 million that the Program had reserved for others. FAC, attached loan table. The opportunistic tax-exempt business, not the relator that reports it, is the party the Act was written to reach.